IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL S. POLSKY, Wis. Stat. ch. 128
Receiver for Olsen's Mill, Inc.,

                                                    OPINION and ORDER

            Appellant,

                                                      09-cv-701-bbc

    v.

RENEW ENERGY, LLC,

           Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Appellant Michael S. Polsky appeals an order of the bankruptcy court on his motion for the allowance of two administrative claims asserted by Olsen's Mill, Inc.: an 11 U.S.C. § 503(b)(9) claim for the value of the corn that Olsen's Mill delivered to appellee Renew Energy, LLC during the 20 days before Renew Energy filed for bankruptcy and an 11 U.S.C. § 503(b)(1)(A) claim for the value of the corn Olsen's Mill delivered post-petition. The bankruptcy court disallowed Olsen's Mill's § 503(b)(9) claim and reserved a ruling on the § 503(b)(1)(A) claim. Because the bankruptcy court's decision to reserve a ruling on Olsen's Mill's § 503(b)(1)(A) claim was not a final order, I will dismiss Polsky's appeal of that claim for lack of subject matter jurisdiction. 28 U.S.C. § 158(a)(1). I will affirm the bankruptcy

1

court's decision to disallow Olsen's Mill's § 503(b)(9) claim because I conclude that it was not clearly erroneous for the bankruptcy court to find that the parties intended the daily wire transfers Renew Energy made during the 20 days pre-petition to be "prepayments" for the corn delivered during the same period instead of for old invoices. Moreover, it was not error for the bankruptcy court to conclude that, because the parties intended the wire transfers to be "prepayments," the corn delivered during the 20 days pre-petition had been paid for.

The following summary of relevant facts and proceedings is drawn from the record of the proceedings before the bankruptcy court. (All citations in the background section are to the bankruptcy court's docket, In re: Renew Energy, LLC, 09-10491-rdm.)

## BACKGROUND

### A. Facts before the Bankruptcy Court

Appellee Renew Energy, LLC and Olsen's Mill, Inc. were parties to a contract dated September 6, 2006 under which Olsen's Mill agreed to supply corn for use in the production of ethanol at Renew Energy's ethanol plant in Jefferson, Wisconsin. Before September 2008, it was the parties' general practice to apply any future payments against the oldest outstanding invoice or invoices whenever Renew Energy fell behind on payments.

In 2008, Renew Energy started running behind on some payments to Olsen's Mill. In September 2008, the president of Olsen's Mill, Paul Olsen, contacted Jeff White, chief

2

executive officer of Renew Energy. Olsen "indicated" that Renew would have to start prepaying for corn, "at the insistence" of Olsen's Mill's secured lender, BNP Paribas. Tr., dkt. #681, at 24. Renew Energy agreed and started sending daily wire transfers marked "PREPAY" that were in round dollar amounts approximating the estimated amount of corn Renew Energy would need the following day (or next two to three days in the case of a weekend). Tr., Debtor's Exhs. 15.1-15.13 (wire transfer documents). On September 17, 2008, a representative from Paribas emailed Olsen's Mill representatives to confirm "that Olsen's Mill has decided for now to no longer ship to related parties unless you get prepayment for the grain." Tr., Debtor's Exh. 2, at 1.

Under the new arrangement, Renew Energy could not receive corn without first making a wire transfer, and if it could not afford all the corn it was using, it would reduce its ethanol production to the level of corn it could afford to purchase. Thus, in an email dated September 29, 2008, a Renew Energy employee told Olsen's Mill that Renew would be sending a wire transfer of $650,000, which was the amount required daily for it to "kee[p] up with our corn consumption," but it would not be able to "keep up this pace." Tr., Debtor's Exh. 5, at 1. In an email dated October 2, 2008, a Renew Energy employee told Olsen's Mill that Renew Energy would be reducing the "corn pull" "[i]n order to make sure that we can pay for the corn we are using." In the same email, the employee attached a spreadsheet showing corn payments and usage "since we've implemented the 'pay-for-use'

3

plan." Tr., Debtor's Exh. 9.1, at 1.

After Renew was told it would have to make daily payments for corn, Renew Energy's accounting manager, Victoria Lynn Davenport, talked to a representative at Olsen's Mill about "how we wanted to handle the application of the payments." Tr., dkt. #681, at 47. To Davenport, it made no difference how the payments were applied to invoices, so long as the ending balance was the same for both Renew Energy and Olsen's Mill. A representative of Olsen's Mill asked Paribas whether it should continue to apply the payments to the oldest invoices as had been its practice or instead should apply the payments to the new invoices. A representative from Paribas told Olsen's Mill to "just do what you were doing previously at least until we have more chance to discuss about next steps." Tr., dkt. #681, Debtor's Exh. 3. (apparently, Olsen's Mill had financial problems of its own, which might explain Paribas's role in this case. In February 2009, Paribas sought and obtained appointment of a receiver for Olsen's Mill.)

Both Olsen's Mill and Renew Energy applied the wire transfer amounts to the oldest outstanding invoice of Olsen's Mill in their respective books. At the same time, both kept separate charts showing the amount of each wire transfer from Renew Energy, the number of bushels of corn purchased with each such wire transfer, the total actual corn used each day and the running total of grain Renew purchased. Renew Energy's daily wire transfers did not match up to the old invoices (because they were estimates of current corn usage), so the

4

payments in the books were split among the old invoices.

Renew Energy continued paying Olsen's Mill for corn by its almost daily wire transfers in amounts tracking current use until Renew Energy filed for bankruptcy under Chapter 11 of the Bankruptcy Code on January 31, 2009. Davenport helped Renew Energy prepare the bankruptcy schedules, including Schedule F, in which the company listed the most recent Olsen's Mill invoices as unpaid (including all the invoices issued during the 20 days before filing for bankruptcy). Before Renew Energy filed for bankruptcy, Davenport had never been through this process. When she helped prepare the bankruptcy materials, she did not know how administrative claims are handled in bankruptcy proceedings.

## B.  Ruling of Bankruptcy Court

Polsky (Olsen's Mill's receiver) moved for the allowance of certain administrative claims to Olsen's Mill under § 503(b)(9) and § 503(b)(1)(A). In an order dated September 30, 2009, Judge Martin disallowed Olsen's Mill's § 503(b)(9) administrative claim for the cost of corn it shipped Renew Energy within the 20 days before Renew Energy filed for bankruptcy. The court concluded that Renew Energy had already paid for that corn through its daily wire transfers to Olsen's Mill because, although both parties continued to book those payments to old invoices, they intended the payments to be prepayments.

In reaching that conclusion, the court pointed out that: (1) both parties "repeatedly

characterized the payments as prepayments" in their communications; (2) in September 2008, Renew Energy's payments had changed from "odd amounts, keyed to match old invoices" to "daily wire transfers in round dollar amounts keyed to estimates of corn usage for that day" (except Friday, which included the weekend); (3) Renew Energy and Olsen's Mill started keeping spreadsheets to track grain usage and payments made; (4) Renew Energy marked its wire transfers "PREPAY" without objection; (5) Renew Energy "booked the payments to old invoices because Olsen's Mill asked them to," not to reflect their understanding of their arrangement; and (6) employees in Renew Energy's accounting department "understandably were unaware that their choice of accounting method might have implications in a bankruptcy." Dkt. #560, at 5-7.

As for Olsen's Mill's § 503(b)(1)(A) claim related to corn delivered post-petition, the judge reserved a ruling on whether the claim should be allowed. Renew Energy had raised a defense that a separate statute (11 U.S.C. § 502(d)) requires disallowing such a claim if it is determined that Olsen's Mill is a "transferee of a transfer avoidable under" 11 U.S.C. § 547, a question being addressed in a preference adversary proceeding. Polsky argued that § 502(d) does not apply at all to § 503(b) claims. Judge Martin pointed out that bankruptcy courts are currently in disagreement on the issue Polsky raised and that it might not be necessary to decide the matter because Polsky might prevail in the related preference adversary proceeding. The court concluded that "[r]esolution of this issue may await the

6

existence of a genuine controversy.  Until a preference has been found to be recoverable, the application of any limitation in § 502(d) would be premature." Id. at 8.

## OPINION

### A.  Jurisdiction

The first question that must be addressed is whether this court has subject matter jurisdiction over Polsky's appeal.  E.g., Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause") (quoting Ex parte McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1869)).  The only basis for appellate jurisdiction Polsky identifies is 28 U.S.C. § 158(a)(1), which means that the appeal must be from "final judgments, orders, [or] decrees."  In the context of a bankruptcy appeal, "finality" is broader than the common understanding of the term because "bankruptcy proceedings are often comprised of many discrete disputes," any of which might be considered a "final judgment" under § 158(a)(1).  In re Forty-Eight Insulations, Inc., 115 F.3d 1294, 1298-99 (7th Cir. 1997).  So long as an order resolves all contested issues related to a given discrete dispute, it will be considered "final."  In re Wade, 991 F.2d 402, 406 (7th Cir. 1993).

There is no question that the disallowance of Olsen's Mill's § 503(b)(9) claim is a final order.  Now that the administrative claim is disallowed, there is "nothing more to do"

7

with respect to that claim.  Cf. Matter of Morse Electric Co., Inc., 805 F.2d 262, 264 (7th Cir. 1986) (once claim has been accepted and valued, it is final even though other, unresolved claims may affect how much of claim can be paid).

However, Judge Martin's decision to reserve a ruling on his § 503(b)(1)(A) claim is quite different.  The bankruptcy court intends to take up the matter after the related preference adversary proceeding has been completed.  Polsky points out that the court decided to reserve a ruling on the ground that the claim might be disallowable under § 502(d), and argues that the bankruptcy court's decision is incorrect because § 502(d) should never apply to § 503(b) claims.  That may be, but that does not make the bankruptcy court's decision a "final order."  The bankruptcy court noted that different courts have reached different conclusions on the question whether § 502(d) applies to § 503(b), and that it may not be necessary to decide the question depending on the results of the preference adversary proceeding.  By ruling as it did, it implied that it continues to entertain the possibility that § 502(d) could apply to a § 503(b) claim.  However, that is not a "discrete dispute."  The "discrete dispute" is whether Polsky's § 503(b)(1)(A) claim should be allowed, and that matter has not been resolved.  Therefore, I will dismiss Polsky's appeal of the bankruptcy court's order reserving a ruling on that question.

8

B.  <u>Section 503(b)(9) Administrative Claim for Corn Delivered Pre-Petition</u>

Under 11 U.S.C. § 503(b)(9), an entity may request "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." The question whether Olsen's Mill's § 503(b)(9) claim should be allowed boils down to whether Renew Energy has paid for the corn Olsen's Mill delivered during the 20 days pre-petition. Polsky contends that the bankruptcy court erred when it disallowed the claim because the evidence shows that Renew Energy had not paid for the corn.

As an initial matter, there is some question about the proper standard of review. Polsky challenges the court's conclusion that the corn delivered during the 20-day period was "prepaid." If this conclusion is a question of fact, it may be set aside only if it is "clearly erroneous." Fed. R. Bankr. P. 8013. However, if is a question of law or the application of law to fact, then the review is *de novo*, <u>Mungo v. Taylor</u>, 355 F.3d 969, 974 (7th Cir. 2004), with the underlying factual findings reviewed for clear errors. <u>In re Lumber Exchange Building Ltd. Partnership</u>, 968 F.2d 647, 649 n.3 (8th Cir. 1992).

In some cases, the question whether something has been "paid" might be purely factual, but in this case, the question is not whether Renew Energy gave Olsen's Mill money, but rather what particular corn was paid for with the money Renew Energy sent. As the bankruptcy court saw it, this boiled down to the parties' intent regarding the purpose of the

9

wire transfers. As for the question of the parties' intent, that is a question of fact. Koch v. Koch, 450 F.3d 703, 710 (7th Cir. 2006) (determinations of intent involve questions of fact). As for the larger question, whether the parties' intent to have the corn prepaid means that the corn *was* prepaid, that is a question of law.

Polsky challenges both issues. First, Polsky contends that the bankruptcy court's finding that the parties intended that the corn be prepaid was clearly erroneous because the court weighed the evidence improperly. In particular, Polsky contends that the court should have placed more weight on the invoices of both parties and on Renew Energy's bankruptcy schedules, which showed the wire transfers as having been assigned to older invoices rather than the current ones. Instead, says Polsky, the court focused on the evidence that the parties had called the transfers "prepayments" at times and that the payments were required before more corn was delivered.

I am not persuaded that the court's finding was clearly erroneous. The court did not simply disregard the invoices or schedules, but rather found reasons to discount their importance. In particular, the court pointed out that the invoices were created simply at the direction of Olsen's Mill and the schedules were created without awareness of how the parties' prepayment agreement would matter for accounting purposes. Polsky's contention that this evidence should be the most reliable because it is "objective" misses the point. Although the evidence may have been reliable for determining what the parties intended to

10

have reflected in their accounting of the transaction, because of the special circumstances (accounting at another's direction and ignorance of the implication of that accounting), it was less reliable for determining what the terms of the parties' new arrangement were (including to which corn the wire transfers were directed).

Moreover, the bankruptcy court's conclusion is "plausible in light of the record viewed in its entirety." Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985). After September 2008, Olsen's Mill required wire transfers before delivering new corn. The transfers were keyed to estimates of incoming corn and characterized as "prepayments" by both parties. The fact that the accounting statements and schedules treat the payments differently does not undermine this conclusion, in light of the facts that show why those documents were different.

Polsky cites In re TI Acquisition, LLC, 410 B.r. 742, 744-45 (Bankr. N.D. Ga. 2009) in support of his position that the parties' intent is best drawn from the parties' accounting practices. In that case, the court concluded that two payments made by the debtor in the 20 days pre-petition were not prepayments for shipments made around the shipment dates, but rather for earlier shipments. Id. at 747-48. However, the case is distinguishable from the present case. In that case, "all witnesses agreed that the Debtor's payments were on prior invoices and were not prepayments for the goods to be shipped." Id. at 748. As the bankruptcy court pointed out in this case, the only other § 503(b)(9) case on point seems

factually closer to this case. In In re WETCO Restaurant Group, LLC, 2008 WL 1848779 (Bankr. W.D. La. April 23, 2008), the bankruptcy court concluded that shipments made during the 20 day period *were* prepayments because, although wire payments were applied to the oldest outstanding invoice, the amount wired corresponded directly to the value of the product to be shipped and the invoices were marked "pre-paid." Id. at *2. Polsky contends that WETCO is distinguishable because there is more documentary evidence in this case that contradicts a finding that the parties intended to prepay: the parties' books and Renew Energy's schedule F. However, as I explained, the importance of those documents in this case is questionable and it was not clearly erroneous for the bankruptcy court not to give them weight.

Polsky also cites several "analogous" cases from a different setting that he contends support his position. These cases involve a question arising under § 547(c)(1)(A), whether an alleged preferential transfer was "intended by the debtor and creditor . . . to be a contemporaneous exchange for new value given to the debtor." At most, the cases Polsky cites suggest that the state of the parties' books *can* be key in determining intent, not that it *must* be. In re Contempri Homes, Inc., 269 B.R. 124 (Bankr. M.D. Pa. 2001) (despite fact that goods would not be delivered unless payment was received that approximated new shipment, payments were not contemporaneous because testimony showed that payments were posted to aged invoices instead of current invoices); In re Fasano/Harriss Pie Co., 71

12

B.R. 287 (W.D. Mich. 1987) (not clearly erroneous to conclude that one of parties intended checks to be applied to outstanding goods instead of contemporaneously because there was "no understanding" between parties as to which checks were to apply to which invoices and debtor's normal accounting practice was to apply payments against oldest invoices); In re Computer Personalities Systems, Inc., 2004 WL 1607005, at *1, 9 n. 12 (Bankr. E.D. Pa. July 2, 2004), aff'd, 320 B.R. 812 (E.D. Pa. 2005) (stating that "[a]n agreement to pay past debt in exchange for new product does not fall within [§] 547(c)(1)" and noting that "how the Transfers were applied speaks to the parties['] intent" but concluding that record was too ambiguous to decide whether the parties intended contemporaneous exchange. Conflicting facts included invoices stating longer payment term, transfers not matching contemporaneous shipments and spreadsheets applying payments to other invoices).

None of the cases Polsky cites establish that the parties' intent can never be different from what the books reflect. I conclude that it was not clearly erroneous for the bankruptcy court to find that this was the situation in this case.

Next, Polsky contends that the parties' intent should not matter; instead, the question should be simply what was on the books and other "objective evidence" about the parties' accounting practices. In other words, how the parties agreed to designate a payment for accounting purposes should govern whether the item is considered "paid" for the purpose of § 503(b)(9). This argument is simply one step away from the argument that such

13

"objective evidence" should be given extra weight when determining intent. As the bankruptcy court pointed out, both § 503(b)(9) cases rely on the parties' intent to reach their conclusions and Polsky can identify no case that establishes that intent is irrelevant. The closest Polsky comes is a comment drawn from Warsco v. Preferred Technical Group, 258 F.3d 557 (7th Cir. 2001), in which the court quotes 1 Robert E. Ginsburg & Robert D. Martin, Ginsberg & Martin on Bankruptcy § 8.02[D] (4th ed. 2000), for the proposition that "[t]he key is how the creditor applies the payment" when analyzing whether a payment is for an antecedent debt or is a prepayment for the purpose of § 547(b)(2). Even taken at face value, the statement does not suggest that "how the creditor applies the payment" is or should be the end-all-be-all rather than simply part of the analysis for determining the parties' intent in such cases.

Finally, Polsky contends that the bankruptcy court's ruling "creates a dangerous precedent" by undermining the validity of sworn debtor's schedules (which are implicitly false in light of the court's ruling) and financial statements and preferring internal communications between a debtor and its vendors. According to Polsky, this could give rise to manipulation of claims because a debtor could sandbag creditors by introducing evidence of "intent" that was not demonstrated on its schedules and financial statements. In addition, Polsky contends, such a ruling will discourage creditors from continuing to supply goods to potential debtors because it allows debtors to "change the rules of the game" post-

14

petition and undermine what would otherwise be a valid administrative claim.

I am not persuaded that either of these are real concerns. As for the possibility of manipulation, that possibility exists just as well with financial statements and schedules. Polsky contends that financial statements are less likely to be false because they are created for third parties, but this ignores the risk that financial statements submitted to the court could be different from ones submitted to other parties. Likewise, false information could be provided in a schedule just as easily as it could be provided under oath on the stand by a witness speaking about "intent."

As for the fear that creditors will be discouraged to continue supplying goods by the ruling, that argument ignores the factual findings of the court. The bankruptcy court found that *the parties* intended the payments to be prepayments despite their accounting practices. In other words, the ruling should have no effect on parties not intending prepayments, except perhaps to motivate the parties to make that intention clearer. Moreover, although Polsky is correct that "the purpose of § 503(b)(9) is to encourage creditors to continue to supply goods," Appellant's Br., dkt. #2, at 15, Olsen's Mill was *getting paid* before sending the goods. It is unlikely that it would have been discouraged from shipping the goods even if it thought that ultimately Renew Energy might not be able to satisfy its older debts, too.

Polsky has not shown that it was clear error to find that parties intended that the corn shipped during the 20 days pre-petition be prepaid or that it was error to conclude that,

15

because the parties intended prepayments, the corn was prepaid. Therefore, I will affirm the bankruptcy court's disallowance of Olsen's Mill's § 503(b)(9) claim.

ORDER

IT IS ORDERED that:

1. Appellant Michael S. Polsky's appeal of the decision of the United States District Court for the Western District of Wisconsin reserving a ruling on the question whether Olsen's Mill's claim under 11 U.S.C. § 503(b)(1)(A) should be allowed or disallowed is DISMISSED for lack of subject matter jurisdiction.

2. The decision of the United States Bankruptcy Court for the Western District of Wisconsin disallowing Olsen's Mill's claim under 11 U.S.C. § 503(b)(9)is AFFIRMED.

3. The case is remanded to the bankruptcy court for further proceedings.

Entered this 5th day of March, 2010.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge